**Feliberto RIVERA, Jr., Plaintiff,**

v.

**Glenn S. GOORD, Commissioner of the New York State Department of Correctional Services, et al., Defendants.**

**No. 99 Civ. 1683(DC).**

United States District Court,
S.D. New York.

March 28, 2003.

Daniel Cherner, Esq., New York, NY, for Plaintiff.

Eliot Spitzer, Esq., Attorney General of the State of New York, by Susan H. Odessky, Esq., Assistant Attorney General, New York, NY, for Defendants.

## *OPINION*

CHIN, District Judge.

Plaintiff Feliberto Rivera, Jr. brings this prisoner civil rights action pursuant to 42 U.S.C. § 1983, alleging that various offi-

cials and employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth, and Fourteenth Amendments. Rivera's claims arise from a prison dental procedure performed in 1997. He claims that after the procedure, various defendants exhibited deliberate indifference to his worsening physical condition and medical needs, while other defendants retaliated against him because he complained about his medical care.

Defendants move for summary judgment based upon (1) Rivera's failure to exhaust administrative remedies; (2) Rivera's failure to raise a material issue of fact on the merits; and (3) qualified immunity. For the reasons that follow, the motion is granted and the complaint is dismissed.

## BACKGROUND

### A. Facts

Rivera's claims against the defendants flow from incidents occurring during two different time periods while he was incarcerated at Green Haven Correctional Facility ("Green Haven"), from April 1996 to December 1997 and from April to July 1999. Construed in the light most favorable to Rivera, the facts are as follows:

#### 1. Claims Against Medical Defendants

Rivera reported to sick call complaining of pain in his mouth on April 30, 1996. (Rivera Aff. ¶ 3; Stolfi Aff. ¶ 3(a)). Dr. Kerschenbaum diagnosed an impacted wisdom tooth and told Rivera that the tooth would have to be extracted. (Rivera Aff. ¶ 3). Rivera was soon transferred to another correctional facility and remained

there for the next seven months. (Rivera Aff. ¶¶ 4–5). When he was transferred back to Green Haven, he was examined again in January 1997 by Dr. Kerschenbaum, who recommended extraction of the impacted tooth. (Rivera Aff. ¶ 6).

At a consultation with Dr. Frattellone, an oral surgeon, on February 19, 1997, Rivera consented to the removal of his wisdom tooth, and underwent surgery believing that his tooth was being extracted. (Rivera Aff. ¶¶ 7–11). Later, however, Rivera discovered that Dr. Frattellone did not remove his tooth, but only removed a piece of tissue from his mouth; Rivera never consented to this procedure. (See Rivera Aff. ¶ 8).[1]

Rivera visited sick call four times during the three days after the surgery, complaining of facial swelling and increasing pain. (Rivera Aff. ¶¶ 13–14; Odessky Decl. Ex. A (Dental Treatment Record ("DTR") 2/21/97); id. (Ambulatory Health Record ("AHR") 2/22/97)). Rivera was given prescription pain medication and antibiotics, and told to use hot compresses on his face. (Rivera Aff. ¶¶ 13–14; DTR 2/21/97; AHR 2/22/97). When the swelling and pain did not abate, Rivera was sent to the emergency room at St. Francis Medical Center ("St. Francis"). (Rivera Aff. ¶ 14; DTR 2/24/97). On February 24, 1997, Rivera underwent an "incision and drainage" procedure at St. Francis. (DTR 2/25/97). He remained at St. Francis for six days before he was discharged to the Green Haven infirmary on March 1, 1997. (Rivera Aff. ¶ 16; DTR 3/3/97). Rivera was discharged from the infirmary on March 7, 1997. (AHR 3/7/97).

Rivera's pain and facial swelling continued over the next ten months, and during

---

1. Defendants do not dispute that Rivera was referred for extraction of his tooth, but they contend that Rivera informed Frattellone that Rivera "had # 16 and # 17 teeth extracted in 1994." (Frattellone Aff. ¶ 4). Defendants contend that Rivera consented to the removal by Dr. Frattellone of a piece of tissue from his gums. (Frattellone Aff. ¶ 5; Odessky Decl. Ex. A (2/19/97 consent form)).

this period he also suffered from migraine headaches, infections, severe burning in his eyes, impaired vision, and partial loss of hearing. On May 2, 1997, he was diagnosed with temporomandibular disorder ("TMJ"), a condition that affects the temporomandibular (or jaw) joint. (Pl. Resp. Ex. E–1 (5/2/97 Consultant Report)). Rivera claims that this medical condition originated from Dr. Frattellone's dental surgery on February 19. (Rivera Aff. ¶ 15). Rivera further states that his physical maladies were exacerbated by the failure of various defendants on the Green Haven medical staff (collectively, the "medical defendants") to provide proper medical care after the two operations.[2] Rivera contends that the medical defendants and other Green Haven medical employees ignored his repeated pleas for medical care and refused to provide him with the treatment he required. (Id.).

For example, Rivera states that on March 3, 1997, days after he returned to the Green Haven infirmary from St. Francis, he asked Dr. Selwin to change his intravenous ("IV") line because it was causing pain and bruising; the doctors at St. Francis had told Rivera to have his line changed if he experienced such symptoms. (Rivera Aff. ¶ 16). Selwin refused to change the IV because Green Haven did not have any replacement IV lines, and Rivera ultimately pulled out the line himself. (Id.).[3] Moreover, on a number of occasions Rivera went to sick call complaining of various symptoms but the medical defendants refused to see or treat him.[4]

As the undisputed evidence shows, however, the medical defendants' refusals to see or treat Rivera reflected their policy to refer Rivera to the Dental Clinic for dental-related problems and on most of these occasions, one of the medical defendants assessed Rivera's condition and determined that further medical treatment was not necessary.[5] On other occasions, medi-

---

2. The medical defendants are Dr. Norman H. Selwin, Facility Health Services Director for Green Haven; Dr. John Frattellone, Oral Surgeon for Green Haven; Dr. William Stolfi and Dr. Philip Kerschenbaum, Dentists; Doctors Lester Silver, William Sohng, and Harry Mamis; and Nurse Patricia Pecenco.

3. Defendants assert that Rivera never asked Selwin to change the line and that Selwin was not given enough time to evaluate the situation before Rivera pulled it out. (Selwin Aff. ¶ 6(a)).

4. See, e.g., Rivera Aff. ¶ 20 (Mar. 7, 1997 refusal by Pecenco); ¶ 26 (Apr. 5, 1997 refusal by Pecenco); ¶ 27 (treatment denied on Apr. 7, 1997 sick call); ¶ 32 (Apr. 14, 1997 request for prescribed eye drops denied by Sohng, who could not find ophthalmologist's report); ¶ 39 (refusal by Silver to see Rivera for scheduled appointment and sick call on May 15, 1997); ¶ 45 (informed by physician's assistant on June 10, 1997 that all requests for treatment had to go through Silver, who was refusing to see Rivera); ¶ 49 (refusal by Silver to see Rivera for a scheduled appointment on June 16, 1997, stating "I refused to see you on your last appointment and I do not want to see you now. I cannot do anything for your chronic medical condition."); ¶ 50 (nurse informed Rivera on June 17, 1997 that doctors were refusing to see him); ¶ 52 (no doctor would see him on sick call on Sept. 8, 1997); ¶ 53 (refusal by Silver on Sept. 9, 1997 to see Rivera or prescribe migraine medication); ¶ 54 (told by nurse on Sept. 10, 1997 that all doctors refused to see him); ¶ 61 (refused treatment by Selwin on Sept. 29, 1997).

5. Silver Aff. ¶ 7(e) ("I directed all of Rivera's dental complaints to the dental staff for appropriate handling."); Selwin Aff. ¶ 12 (noting that the policy was documented Oct. 29, 1997); (10/29/97 AHR); Sohng Aff. ¶ 7(b) (Apr. 7, 1997 assessment); ¶ 7(c) (Apr. 14, 1997 assessment); ¶ 7(d) (May 12, 1997 assessment referred Rivera to Silver as his "primary care provider" and noted that Rivera was receiving regular care from dental providers); Stolfi Aff. ¶ 3(aa) (May 6, 1997 evaluation based on two x-rays); ¶ 3(bb) (June 13, 1997 evaluation based on x-ray taken on June 2, 1997); see Pecenco Aff. ¶ 9; Selwin Aff. ¶ 14; Silver Aff. ¶ 8.

cation could not be provided to Rivera without more evaluation or without consulting the prescribing physician. (Selwin Aff. ¶ 7; Silver Aff. ¶ 7(f)).

The medical records show, and a reasonable jury could only find, that Rivera received extensive medical care from the medical defendants and the rest of Green Haven's medical staff. In 1997, Rivera was examined at least 30 times by 21 different doctors, including two oral surgeons, at least two dentists, a radiologist, an ophthalmologist, an audiologist, and an ear, nose, and throat specialist. Rivera was sent to three outside facilities—St. Francis, Mid–Hudson Radiology, and St. Agnes Hospital—for medical treatment. Finally, Rivera concedes that on numerous visits to sick-call, the medical defendants and other staff members listened to his complaints and provided him with medical treatment, including prescribing medications for his pain, infections, and eye and ear problems, and performing x-rays and an HIV test. Moreover, Rivera requested and received pain medication almost continuously throughout 1997.[6]

When the medical defendants refused to provide Rivera with his preferred pain medication or treatment, the medical de-

fendants based such refusals on their own evaluations of Rivera, or relied upon the evaluations of other providers.[7] On several of these occasions, Rivera refused some kind of treatment. (E.g., AHR 3/17/97 (refused Motrin); 6/12/97 (refused Motrin); 7/30/97 (refused Tylenol); DTR 9/3/97 & 9/4/97 (taken to dental clinic as part of grievance process but refused any treatment); AHR 9/10/97 (Rivera walked out)).

## 2. Claims Against Correctional Officers

Rivera contends that defendants Kelly, Brady, Belton, Meyer, and Nagy, all correctional officers (the "correctional defendants"), retaliated and used excessive force against him because he complained about his medical care.

### a. Retaliation and Excessive Force Claims Against Kelly, Brady, and Belton

Rivera alleges that three of the correctional defendants physically assaulted him in retaliation for the complaints he filed. Rivera states that he was removed from the clinic by Kelly, Brady, Belton, and other officers on September 11, 1997. As

**6.** E.g., AHR 3/10/97 & 3/12/97 (Percocet); 3/17/97 (Motrin); 3/24/97 (Tylenol); 3/26/97 & 4/5/97 (Fioricet); 4/7/97 (Tylenol); 4/15/97 & 4/16/97 (Fioricet); 4/28/97 (Advil); 4/30/97 (Tylenol); 5/6/97 & 5/20/97 (Flexeril); 5/14/97, 5/20/97 & 5/21/97 (Fioricet); 6/4/97 (Ibuprofen); 6/10/97 (Tylenol); 6/12/97 (ECA-SA); 6/13/97 (Indocin); 6/17/97, 7/8/97, 7/15/97, 7/29/97, 8/26/97 & 9/3/97 (Fioricet); 9/12/97 & 10/1/97 (Motrin); 10/7/97 (Tylenol); 10/14/97 (Fioricet).

**7.** E.g., AHR 3/17/97 (Silver found no sign of inflammation and offered Motrin); 3/17/97 (nurse unable to "override" Silver's refusal to provide Percocet); DTR 3/17/97 (evaluated and advised to return if swelling increases); AHR 4/28/97 (Fioricet not delivered yet, Rivera given Advil); 5/12/97 (no chart available to confirm prescription); 6/7/97 (refusal

based on prior evaluation, Rivera had no more than usual swelling, x-ray was normal, and Rivera advised to follow up with Silver); 6/10/97 (Rivera scheduled to see Silver for evaluation and given Tylenol); 6/16/97 (Rivera referred to dental); 7/23/97 (Rivera already had medication renewed and advised to follow up with dental); 7/30/97 (medication not yet delivered, Rivera offered Tylenol); 9/3/97 (advised to return in morning for evaluation, but returned later that night and granted renewal); 9/4/97 (chart unavailable to confirm renewal of medication); 9/5/97, 9/6/97 & 9/8/97 (chart unavailable and pharmacist could not fill without new prescription); 9/9/97 (Silver would not renew medication); 9/12/97 (provided Motrin to last until follow-up with Silver); 9/29/97 (Selwin refused to refill without seeing patient).

Rivera was walking, Kelly told him that he was "sick of [Rivera writing] complaints" and that if Rivera turned around, Kelly would "kick [his] ass." (Rivera Supp. Aff. Ex. A (9/11/97 Letter to Elijah Williams)). Kelly, Belton, and Brady then pinned Rivera against a wall, banging his face into the wall and twisting his arms behind him. (Rivera Aff. ¶ 56). Defendants do not specifically dispute these facts but assert that Rivera never exhausted administrative remedies by filing a grievance regarding the incident.

Rivera admits that he never filed a formal grievance, but asserts that he wrote to his therapist, Mr. Montero, the following week, detailing the alleged assault. (Rivera Supp. Aff. ¶ 2, 4). Rivera alleges that this letter was intercepted by Mental Health Unit Chief L. Klein, and forwarded to Artuz. (Id. ¶ 3). Rivera asserts that Kelly subsequently visited Rivera's cell on September 29, 1997, purportedly to investigate the matter. (Id. ¶ 4 & Ex. C (10/1/97 Letter to Deputy Sup't Schneider)).

### b. *Retaliation Claim Against Meyer*

Rivera alleges that, in April 1999, an officer told him that Meyer "was trying to influence [the other officer] to harass plaintiff." (Am.Comp.¶ 92).[8] Later, Meyer allegedly told Rivera directly that "because of [his litigation, Rivera] wasn't going to last long in [Meyer's] block." (Rivera Supp. Aff. Ex. F (4/25/99 Letter)). Rivera also alleges that Meyer influenced other corrections officers to mislead him about his work assignment. As a result of his alleged misunderstanding, Rivera was issued a misbehavior report for being out of his cell without permission. (Id. (5/1/99 Letter)). He was sentenced at a subsequent disciplinary hearing to three days confinement. (Am. Compl.¶ 97). Rivera sent letters about Meyer and the other officers to Superintendent Artuz and Commissioner Goord on April 25, 1999 and May 1, 1999. (Rivera Supp. Aff. Ex. F (4/25/99 Letter); id. (5/1/99 Letter)).

Within days, Artuz responded by sending Rivera several memoranda with the subject heading "Staff Harassment." Artuz replied that he had "forwarded [each] letter for action to Deputy Superintendent Schneider," and that Rivera would "be hearing from a staff member in the near future." (Id. (4/27/99 Artuz Memo); Id. (5/7/99 Artuz Memo)). Rivera next received a memorandum from Lt. Russett, dated July 19, 1999, responding to Rivera's allegations and concluding that "there is no sufficient evidence to substantiate your claims." (Id. (Russett Memo)). Finally, Rivera received correspondence from Lt. Albury, advising Rivera that his "allegations ... could not be confirmed" and that the matter was "closed." (Id. (Albury Memo)). Albury advised Rivera that he "must utilize the appeal mechanism" with "regards to [ ] disciplinary sanctions." (Id.).

---

**8.** Defendants move to reject Rivera's Rule 56.1 Statement. (Reply Mem. at 2–4). Rivera's Statement refers only to the amended complaint. The amended complaint, filed pro se, was verified, and thus it is acceptable as an affidavit for the purposes of this motion. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (noting that plaintiff "verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge" and finding that "[a] verified complaint is to be treated as an affidavit for summary judgment purposes"); *see also Wells v. Wade,* 36 F.Supp.2d 154, 157–58 (S.D.N.Y.1999) (declining to treat pro se plaintiff's failure to respond to defendants' motion for summary judgment as an admission where plaintiff had "filed a verified complaint sworn before a notary public and further testified under oath regarding the allegations of his complaint at his deposition by defendants").

### c. Retaliation Claims Against Nagy

In his amended complaint, Rivera asserts two retaliation claims against Nagy. First, he alleges that Nagy retaliated against him by lying at an August 1997 disciplinary hearing, causing Rivera to be found guilty and to be sentenced to 90 days confinement and 120 days loss of privileges. (Am.Compl.¶¶ 63, 65). Rivera does not dispute that he did not file a grievance regarding this incident.

Second, Rivera also alleges that Nagy, already named as a defendant in the instant case, presided at a July 1999 disciplinary hearing over Rivera's objections. (Art. 78 Pet. ¶ 17). Rivera claims that Nagy adjourned the hearing so that he would remain confined to his cell as he had been since the filing of the underlying disciplinary report, resulting in confinement two days longer than that permitted by applicable regulations. (Id. ¶ 18; Am. Compl. ¶ 106). When Nagy reconvened the hearing, Rivera alleges that Nagy conducted the proceedings in a biased manner and intimidated Rivera when he presented his defense. (Art. 78 Pet. ¶ 18). Rivera was found guilty of two of the four charges in the misbehavior report and sentenced to 30 days keep-lock and the loss of privileges. (Id. ¶ 15). Rivera appealed the outcome of the disciplinary hearing (Rivera Supp. Aff. Ex. E (Bliden Memo)) and filed an Article 78 petition asserting a denial of due process as a result of Nagy's allegedly retaliatory conduct. (Art. 78 Pet. ¶ 39). Rivera's disciplinary record for this incident was later expunged because the hearing tape had been destroyed. (Rivera Supp. Aff. Ex. E (Letter from Hon. James Pagones)).

Defendants do not dispute these facts, but assert that Rivera's failure to file a formal grievance for Nagy's alleged conduct bars his claims.

### C. Procedural History

Rivera filed this action pro se on March 5, 1999 and filed an amended complaint on July 22, 1999. Defendants moved to dismiss, and the motion was granted in part and denied in part. *Rivera v. Goord,* 119 F.Supp.2d 327 (S.D.N.Y.2000).

After filing this lawsuit, Rivera submitted his complaint in this case to DOCS as a grievance. By memorandum dated September 17, 2001, DOCS denied the grievance on the following grounds:

> [A]n inmate must submit a complaint within 14 calendar days of an alleged occurrence. Exceptions to this time limit may be approved by the IGP Supervisor based on mitigating circumstances. The act of solely taking a case to court is not mitigating circumstances. As your law suit makes allegations dating back to 1996, this law suit cannot be processed as a grievance.

(Rivera Supp. Aff. Ex. G).

Rivera appealed by letter dated October 15, 2001 to the DOCS Central Office Review Committee. (*Id.*). By letter dated November 5, 2001, the director of the Inmate Grievance Program ("IGP") denied the appeal on the grounds that Rivera had not provided "any mitigating circumstances for an exception to the time limits for filing a grievance or appeals." (*Id.*).

In the meantime, Rivera obtained counsel in this case and the parties engaged in discovery. This motion followed.

### DISCUSSION

### I. Applicable Law

I discuss the law applicable to (a) summary judgment motions, (b) the administrative exhaustion of prisoner claims, and (c) the merits of claims under § 1983, in turn.

## A. Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment must demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *see Gonzalez v. Rite Aid of N.Y., Inc.*, 199 F.Supp.2d 122, 129 (S.D.N.Y.2002). Rather, the nonmoving party must present significant probative evidence tending to support the complaint. *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). There is no issue for trial unless there exists sufficient evidence favoring the nonmoving party to support a jury verdict for that party. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). The plaintiff "must provide the Court with 'some basis' to believe that his 'version of relevant events is not fanciful.'" *Yearwood v. LoPiccolo*, No. 95 Civ. 2544(DC), 1998 WL 474073, at *3 (S.D.N.Y. Aug.10, 1998) (quoting *Dresdner v. Brockenton*, No. 93 Civ. 8814(DLC), 1996 WL 452275, at *1 (S.D.N.Y. Aug.8, 1996); *Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 38 (2d Cir.1986)).

## B. Exhaustion

Under the Prison Litigation Reform Act (the "PLRA"), an inmate must exhaust all available administrative remedies before filing suit in federal court. Specifically, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In the Second Circuit, exhaustion is an affirmative defense, and thus defendants bear the burden of proof. *See Jenkins v. Haubert*, 179 F.3d 19, 28–29 (2d Cir.1999). Although the PLRA provides for dismissal for failure to state a claim

without requiring exhaustion, no such authorization exists for a grant of summary judgment, and thus it is not settled whether a court should proceed to examine an unexhausted claim on the merits. *See* 42 U.S.C. § 1997e(c)(2); *McCoy v. Goord*, 255 F. Supp.2d 233, 252, No. 01 Civ. 3133(DC), 2003 WL 1479232, at *13 (S.D.N.Y. Mar.25, 2003).

### 1. *What Constitutes Exhaustion*

■ Inmates in state custody may file grievances formally through the DOCS IGP, which consists of three levels:

> The first is the filing of a complaint with the facility's Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany. A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Hemphill v. New York*, 198 F.Supp.2d 546, 548 (S.D.N.Y.2002) (describing the procedure under N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7) (citations omitted) (finding that merely sending a letter to prison superintendent cannot satisfy IGP). There is also a more informal, "expedited" grievance procedure for addressing harassment by DOCS staff, defined as "employee misconduct meant to annoy, intimidate, or harm an inmate." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.11(a).[9]

The IGP is "intended to supplement, not replace, existing formal or informal channels of problem resolution." N.Y. Comp.

Codes R. & Regs. tit. 7, § 701.1. Although several courts have held that § 701.7 is the exclusive method of exhaustion, *see, e.g., Rodriguez v. Hahn*, 209 F.Supp.2d 344, 347–48 (S.D.N.Y.2002), the Second Circuit has held that successful "[r]esolution of the matter through informal channels satisfies the [PLRA's] exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy." *Marvin v. Goord*, 255 F.3d 40, 43 n. 3 (2d Cir.2001) (citation omitted) (finding plaintiff exhausted remedies where he "succeeded in overturning the prohibition informally by complaining to various correctional officers"); *see Perez v. Blot*, 195 F.Supp.2d 539, 545–46 (S.D.N.Y. 2002). The law is not well-settled in this area, and the Second Circuit has recently appointed counsel in a number of cases (including *Hemphill*) to clarify "whether inmates who did not fully comply with the dictates of New York law nonetheless exhausted their claims in other ways." *Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003).

### 2. *When Exhaustion May Be Excused*

■ Generally, corrections officials are entitled to strict compliance with administrative procedures. *See, e.g., Hemphill*, 198 F.Supp.2d at 549. Under certain circumstances, however, defendants may be estopped from asserting that a plaintiff has not exhausted administrative remedies

---

9. Under that procedure:

(1) An inmate who feels that s(he) has been the victim of employee misconduct or harassment should first report such occurrences to the immediate supervisor of that employee. This does not preclude submission of a formal grievance.

. . . . .

(3) The superintendent or his designee shall promptly determine whether the grievance, if

true, would represent a bona fide case of harassment as defined in subdivision (a) of this section. If not, then it shall be returned to the IGRC for normal processing.
N.Y. Comp.Codes R. & Regs. tit. 7, § 701.11(b).

for a particular claim. A plaintiff may proceed despite nonexhaustion where he has been "led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated." *O'Connor v. Featherston*, No. 01 Civ. 3251(HB), 2002 WL 818085, *2 (S.D.N.Y. Apr.29, 2002) (citing *Feliciano v. Goord*, No. 97 Civ. 263(DLC), 1998 WL 436358, *2 (S.D.N.Y. July 27, 1998) (inmate assured that incidents were not issues for grievance but "security matters," that security personnel would not provide inmate with grievance forms, and that the matter would be investigated by security personnel as a prerequisite to the filing of a grievance)); *see Heath v. Saddlemire*, No. 96–CV–1998 (FJS)(RF), 2002 WL 31242204, at *4–5 (N.D.N.Y. Oct. 7, 2002) (finding that defendants were estopped from asserting nonexhaustion where plaintiff relied on letter from defendants stating that he had "followed the correct procedure by notifying the Inspector General of [his] complaint").

■ Similarly, defendants may be estopped where a plaintiff has been led to believe that administrative remedies were unavailable. *E.g., Berry v. City of New York*, No. 00 Civ. 2834(RMB)(JCF), 2002 WL 31045943, *8 (S.D.N.Y. June 11, 2002) (noting that plaintiff may assert estoppel where he had been led to believe that filing of a grievance would be " 'impossible or futile' " but finding no basis for such belief where plaintiff had previously filed several grievances in other matters and had been successful in at least one) (quoting *Burns v. Moore*, 99 Civ. 0966(LMM)(THK), 2002 WL 91607, *5 (S.D.N.Y. Jan. 24, 2002)). Thus, a plaintiff may assert estoppel, and exhaustion may be excused, if he has been led to believe that an incident was not a grievance matter and would be otherwise investigated or that filing a grievance would be futile.

## C. *Section 1983*

■ To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) the defendants acted under "color of state law" (2) to deprive plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Shabazz v. Vacco*, No. 97 Civ. 3761(DC), 1998 WL 901737, at *2 (S.D.N.Y. Dec.28, 1998) (citing *Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir.1994)); *see also Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). An individual defendant is not liable under § 1983 absent personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994); *Morris v. Eversley*, 205 F.Supp.2d 234, 241 (S.D.N.Y.2002).

Rivera asserts five claims under § 1983: an Eighth Amendment deliberate indifference claim against the medical defendants; an Eighth Amendment excessive force claim against correctional defendants Kelly, Belton, and Brady; a First Amendment retaliation claim against correctional defendant Meyer and two First Amendment retaliation claims against correctional defendant Nagy. Accordingly, I discuss the applicable standards for both Eighth Amendment claims and for the First Amendment retaliation claims.

### 1. *Eighth Amendment Claims*

The Eighth Amendment prohibits the infliction of "cruel and usual punishment" on those convicted of crimes. U.S. Const. amend. VIII. Rivera asserts two Eighth Amendment claims: deliberate indifference to his medical needs and the use of excessive force.

### a. *Deliberate Indifference to Medical Needs*

■ To prevail on an Eighth Amendment claim based on the denial of medical care, a prisoner must prove "deliberate

indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The deliberate indifference standard includes both a subjective and an objective element. *See United States v. Walsh*, 194 F.3d 37, 48 (2d Cir.1999) (citing *Hudson v. McMillian*, 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994).

██ First, the alleged deprivation of care must be "sufficiently serious" in objective terms. *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In the Second Circuit, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in ... the unnecessary and wanton infliction of pain.' " *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir.2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)). In the context of dental care, the Second Circuit has observed that "dental conditions (like other medical conditions) vary in severity and ... a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison,* at 136–37.

██ Second, "the charged official must act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321). The required culpability is something "more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. A plaintiff must allege that an official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

### b. *Excessive Force*

██ To prevail on an excessive force claim, a plaintiff first must show that the alleged use of force is "objectively sufficiently serious or harmful enough" to be actionable. *Walsh,* 194 F.3d at 50 (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. 995). A claim of excessive force may be established even if the victim does not suffer serious or significant injury, if plaintiff can demonstrate that the amount of force used is more than *de minimis,* or otherwise involves force "repugnant to the conscience of mankind." *Walsh,* 194 F.3d at 48 (citing *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 995). The Second Circuit has held that not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom.,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

██ Second, a plaintiff alleging excessive force must also meet a subjective requirement; he must show that the defendant acted wantonly with a "sufficiently culpable state of mind." *Walsh,* 194 F.3d at 50 (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. 995); *see also Sims v. Artuz,* 230 F.3d 14 (2d Cir.2000). Where a state official is accused of using excessive physical force against an inmate, the inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Walsh,* 194 F.3d at 48–49.

### 2. *First Amendment Claims*

██ It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Colon,* 58 F.3d at 872; *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To prevail on a First Amendment retaliation claim under § 1983, "a

plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted). As for the second prong, a prisoner alleging retaliation must show that the protected conduct was "a substantial or motivating factor" behind the alleged retaliatory conduct. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996). When prison disciplinary proceedings are alleged to be retaliatory, evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon*, 58 F.3d at 872–73. Because claims of retaliation are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care." *Id.* at 872.

 Moreover, only those retaliatory acts that are likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment are actionable under § 1983; in other words, allegations of de minimis acts of retaliation are not sufficient. *Thaddeus–X v. Blatter*, 175 F.3d 378, 397 (6th Cir.1999), *cited with approval in Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir.1999). On the other hand, deprivations that are not sufficiently serious to constitute a due process violation may be sufficient to constitute a First Amendment violation, as different considerations come into play. *See Wells v. Wade*, No. 96 Civ. 1627(SHS), 2000 WL 1239085, *3 (S.D.N.Y. Aug.31, 2000) (citing *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). The Sixth Circuit has held that even five days of administrative segregation, imposed for a retaliatory purpose, was more than de minimis for these purposes. *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir.2000); *see also Wells*, 2000 WL 1239085, at *4 (holding that reasonable jury could find that 13 days in "keeplock" would be "likely to 'chill a person of ordinary firmness from continuing to engage' in activity protected by the First Amendment" (citations omitted)).

## II. *Application*

### A. *Administrative Exhaustion*

It is undisputed that Rivera exhausted his claims against the medical defendants. (Def. Reply Mem. at 7 (arguing only that Rivera has failed to exhaust administrative remedies for retaliation and excessive force claims)). In the discussion that follows, I conclude that Rivera has exhausted his administrative remedies as to defendant Nagy for his alleged retaliation in conducting the 1999 hearing. I conclude that Rivera has failed to exhaust his administrative remedies as to the remaining claims, and thus I dismiss these claims without prejudice, but on the condition that defendants provide Rivera with an opportunity to exhaust his administrative remedies in light of the Supreme Court's decision in *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). I conclude by rejecting defendants' argument for the adoption of a "total" or "complete" exhaustion rule—that, under the PLRA, all of Rivera's claims must be dismissed for the failure to exhaust administrative remedies as to even one claim.

A threshold issue is presented by Rivera's attempt, after he filed this lawsuit, to exhaust by submitting the complaint to DOCS and asking DOCS to treat it as a grievance. Although DOCS rejected the grievance, it did so solely on a technical basis—the "grievance" was untimely and DOCS did not consider the filing of a

lawsuit to be a "mitigating circumstance[ ]" sufficient to warrant a waiver of the time limitation. DOCS did not consider the "grievance" on the merits, but, more significantly, as at least four circuits, including the Second Circuit, have held, "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Neal v. Goord*, 267 F.3d 116, 121–22 (2d Cir.2001); *see Jackson v. Dist. of Columbia*, 254 F.3d 262, 268–69 (D.C.Cir.2001); *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir.1999); *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). Accordingly, this submission of the complaint did not constitute exhaustion.

### 1. The Claims Against Nagy

#### a) 1999

■ Rivera claims that Nagy presided over a 1999 disciplinary hearing so that he could adjourn and delay the hearing, thus prolonging Rivera's time in pre-hearing keeplock. Rivera asserts that Nagy's alleged conduct is nongrievable under N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e)(1), which provides that "[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable."

Nagy's alleged conduct in presiding over the disciplinary hearing was properly the subject of an appeal of the hearing. *See Samuels v. Selsky*, No. 01 Civ. 8235(AGS), 2002 WL 31040370, at *8 (S.D.N.Y. Sept.12, 2002) ("Disputes stemming from a disciplinary hearing are properly appealed directly and not through the [IGP]."); *Gray v. Murry*, No. 99 Civ. 2767(WHP), 2001 WL 826088, at *3 (S.D.N.Y. July 19, 2001) (noting that "a grievance directly challenging the ... proceeding on the disciplinary charge would not be grievable"). Because Rivera raised, in his administrative appeal, his objections to the alleged conduct, he exhausted his administrative remedies regarding this claim through the appropriate correctional channels.[10]

The cases cited by defendants in this respect are inapposite. Generally, where a court has found nonexhaustion of a claim despite the appeal of a disciplinary hearing decision, the plaintiff had not raised objections in the appeals process to the behavior underlying the claim, or the alleged behavior did not occur at the hearing itself.[11]

Rivera raised objections to Nagy's alleged conduct of the 1999 hearing in his

---

**10.** *See Samuels*, 2002 WL 31040370 at *8 (finding that "issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally"); *Flanagan v. Maly*, No. 99 Civ. 12336(GEL), 2002 WL 122921, at *2 (S.D.N.Y. Jan.29, 2002) (finding that the appeals process fulfills the PLRA exhaustion requirement "by giving the state an opportunity to correct any errors and avoiding premature federal litigation," and that "resort to additional internal grievance mechanisms would be pointless" where "the alleged deprivation of rights has been approved at the highest level of the state correctional department").

**11.** *See Khalid v. Reda*, No. 00 Civ. 7691(LAK)(GWG), 2003 WL 42145, at *5

(S.D.N.Y. Jan. 23, 2003) (finding nonexhaustion "[b]ecause [plaintiff] failed to raise the issue he raises here on his administrative appeal"); *Cherry v. Selsky*, No. 99 Civ. 4636(HB), 2000 WL 943436, at *6–7 (S.D.N.Y. July 7, 2000) (emphasizing that plaintiff did not bring "a claim with respect to the due process afforded him at his disciplinary hearing, but rather based his due process claim solely on the administrative review performed by defendant"); *Benjamin v. Goord*, No. 02 Civ. 1703(NRB), 2002 WL 1586880 (S.D.N.Y. July 17, 2002) (finding nonexhaustion of plaintiff's claim of excessive force based on incident leading to disciplinary hearing, despite plaintiff's administrative appeal, where no grievance had been filed as to underlying incident).

administrative appeal. Therefore, Rivera has exhausted his administrative remedies as to this claim, and it would be "pointless" to require him to pursue "additional grievance mechanisms." *Flanagan*, 2002 WL 122921 at *2.

### b) *1997*

■ Rivera does not raise any issue of fact regarding exhaustion of remedies for the claim against Nagy for his alleged conduct at the 1997 hearing. (Am. Compl. ¶ 65 (stating that he sent a letter directly to Commissioner Goord, but not mentioning any other efforts to grieve the alleged conduct)). Therefore, he has failed to exhaust administrative remedies as to this claim. *See, e.g., Mills v. Garvin*, No. 99 Civ. 6032(CM), 2001 WL 286784, at *3 (S.D.N.Y. Mar.2, 2001) (noting that "[l]etter writing is not the equivalent of an exhaustion of . . . the prescribed grievance procedure").

### 2. *The Claims Against the Remaining Defendants*

It is undisputed that Rivera did not file formal grievances as to the remaining defendants. It is also undisputed that Rivera never complained to immediate supervisors of the allegedly offending defendants, nor does Rivera allege that prison officials interfered with his access to any aspect of the grievance program. *Cf. Gonzalez v. Officer in Charge of Barber Shop on Duty on May 13, 1999*, No. 99 Civ. 3455(DLC), 2000 WL 274184, at *3 (S.D.N.Y. Mar.13, 2000) (ruling that assertions that inmate had been "frustrated" in his attempts to file grievances required denial of motion to dismiss). Similarly, Rivera does not contend that administrative remedies were not available for these claims. *E.g., Berry*, 2002 WL 31045943 at *8. Thus, the only issue remaining is whether defendants are estopped from asserting a nonexhaustion defense. As discussed below, I conclude

that they are not, and that therefore Rivera has failed to exhaust administrative remedies with respect to these claims.

### a. *Kelly, Belton, and Brady*

■ Rivera concedes that he did not file a grievance for his claims arising from the alleged physical assault by defendants Kelly, Belton, and Brady. (Rivera Supp. Aff. ¶ 3). Rivera contends, however, that an investigation was initiated on his behalf as a result of the intercepted letter to his therapist, and that, in fact, defendant Kelly came to Rivera's cell purportedly to investigate the incident. His subsequent letter to Deputy Superintendent Schneider mentions the purported investigation, but only as support for his allegations of breaches of confidentiality as to his correspondence with his therapist. (Rivera Supp. Aff. Ex. C (asking Deputy Sup't Schneider "who [gave] you or your staff any authority to . . . remove a personal letter written to my therapist?")). Rivera has provided no evidence that he achieved favorable resolution informally or that he sought an administrative review of any unfavorable resolution. *Cf. Marvin*, 255 F.3d at 43 n. 3 (finding plaintiff need not show exhaustion through formal grievance procedure where he succeeded in resolving matter informally). Therefore, I conclude that defendants have established that Rivera did not exhaust administrative remedies for this incident.

### b. *Meyer*

■ Rivera argues that his correspondence with the defendants amounts to exhaustion of administrative remedies for the claim against Meyer under the expedited procedure for allegations of staff harassment. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.11. Technically, Rivera did not follow § 701.11, choosing to write Superintendent Artuz directly rather than report the al-

leged conduct to Meyer's immediate supervisor. Although Rivera did not comply with the technical requirements of the expedited procedure, this failure does not automatically amount to a failure to exhaust.

The harassment procedure is a less formal grievance channel. When such informal procedures are used and produce a favorable result, the exhaustion requirement is satisfied, as it makes little sense to require a further, formal grievance process. *See Marvin*, 255 F.3d at 43 n. 3 (finding plaintiff need not show exhaustion through formal grievance procedure where he succeeded in resolving matter informally). Here, defendants' responses informed Rivera the matter had been investigated and was "closed" because his allegations "could not be confirmed." (Rivera Supp. Aff. Ex. F (Albury Memo)). Yet the outcome of the investigation produced no favorable resolution for Rivera, and Rivera failed to appeal as provided under § 701.11(7). Thus, he has not exhausted his administrative remedies for this claim.

### 2. *Exhaustion Was Not Waived*

 A corollary to the principle that nonexhaustion is an affirmative defense is that defendants may waive it by failing to properly assert the defense. *Davis v. New York*, 316 F.3d 93, 101 (2d Cir.2002) (raising question for remand "whether the defendants waived compliance with the [PLRA] exhaustion requirement by failing to raise it"). Here, defendants are entitled to assert the defense, despite their earlier failure to do so, in light of the changes wrought by *Porter v. Nussle. See Abney v. County of Nassau*, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (finding that, because "the affirmative defense was not available to be asserted in this case until 2002," "[d]efendants cannot therefore be faulted for failing to earlier raise the defense"). In light of the Second Circuit's contrary rule at the time, defendants would have had no basis for asserting the defense of nonexhaustion before *Porter v. Nussle.* Thus, defendants may raise it now.

### 3. *The Dismissal Is Conditional*

 Like other prisoners, however, Rivera cannot avoid the ramifications of *Porter v. Nussle.* Although Rivera filed his complaint before the decision, "the broad exhaustion requirement announced in *Nussle* applies with full force" to his claims. *Espinal v. Goord*, No. 01 Civ. 6569(NRB), 2002 WL 1585549, at *2 n. 3 (S.D.N.Y. July 17, 2002). Thus, Rivera must exhaust, even though the law in this Circuit did not require him to do so when the underlying events occurred.

Upon dismissal, Rivera will necessarily face expired administrative deadlines. As DOCS acknowledged in rejecting Rivera's post-suit effort to exhaust, however, those deadlines allow for late grievances in the event of mitigating circumstances, including referral from courts. As it would be unfair to hold Rivera unerringly to the standard imposed by the intervening decision of *Porter v. Nussle*, the dismissal of Rivera's unexhausted claims (without prejudice) is conditioned upon defendants' allowing Rivera to exhaust his administrative remedies for these claims and hearing Rivera's complaints on the merits at the administrative level. DOCS must consider the claims on the merits as long as Rivera files written grievances asserting the unexhausted claims within 14 days after receipt of this decision and diligently makes all efforts to fully exhaust. *See Nelson v. Rodas*, No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at *4 n. 10 (S.D.N.Y. Sept. 17, 2002) (advising plaintiff to file all grievances within 14 days of the decision, and suggesting that plaintiff may seek judicial remedy should DOCS deny such grievances as untimely); *Santiago v. Meinsen,*

89 F.Supp.2d 435, 441 (S.D.N.Y.2000) (noting that if DOCS fails to allow an exception for mitigating circumstances, plaintiff may file a new action "explaining ... his failure to file a timely grievance[,] his efforts to file a late grievance[, and] the alleged mitigating circumstances," concluding that a court would then decide whether the exhaustion requirement should be waived in light of "appropriate circumstances"). Rivera may then refile those claims after exhaustion if he is unsuccessful in the administrative proceedings.

To be clear, I am imposing this condition for the following reason. On the one hand, DOCS may rely on *Porter v. Nussle* retroactively and, as I have held, it has not waived the exhaustion defense because under prior law Rivera was not required to exhaust. On the other hand, Rivera is being held to the exhaustion requirement, even though he filed suit several years before *Porter v. Nussle*. It would be highly unfair to permit DOCS to now reject Rivera's grievances as untimely, when he was not required to exhaust when he filed suit, at the same time that DOCS can

assert nonexhaustion as a defense. In other words, DOCS cannot have it both ways.

If DOCS refuses to consider the unexhausted claims on the merits, then Rivera may reinstate this action and I will determine at that time whether I may consider his claims on the merits on the basis that he has exhausted all available administrative remedies.[12]

### 4. *"Total" or "Complete" Exhaustion*

Because I conclude that Rivera failed to exhaust his administrative remedies for some but not all of his claims, I turn to defendants' argument that, under the PLRA, where a plaintiff has not exhausted administrative remedies for even one of his claims, the entire suit must be dismissed. Section 1997e(a) states that "no action shall be brought" until plaintiff has exhausted administrative remedies. Defendants argue that the term "action" should be construed to encompass plaintiff's suit in its entirety.[13]

District courts are divided on this issue, as the Second Circuit has not addressed it. *Ortiz*, 323 F.3d 191, 195 (2d Cir.2003) (or-

---

**12.** The law regarding the effect of a time-barred grievance is also not well-settled. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7(a)(1) (allowing for "exceptions ... based on mitigating circumstances (e.g., attempts to resolve informally by the inmate, referrals back to the IGP by the courts, etc.")). *Compare Benjamin v. Goord*, No. 02 Civ. 1703(NRB), 2002 WL 1586880, at *2 (S.D.N.Y. July 17, 2002) (noting "[i]f the time limit is not waived, plaintiff will be precluded from filing suit for the excessive force claim on the grounds that he failed to submit a timely grievance and therefore can no longer exhaust his administrative remedies"), *with Miller v. N.Y. Dep't of Corr. Servs.*, No. 97 Civ. 4925(RMB)(MHD), 2002 U.S. Dist. LEXIS 21176, at *9 n. 3 (S.D.N.Y. Mar. 4, 2002) (noting that several courts have held that time-barred administrative remedies are not "available"). *See also Jernigan v. Stuchell*, 304 F.3d 1030, 1033 (10th Cir.2002) (rejecting argument that time-barred remedies "are ex-

hausted by default" as it "would trivialize the Supreme Court's holdings in *Booth* and *Porter* that exhaustion is now mandatory"); *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) (same).

**13.** Defendants also argue that a total exhaustion rule in civil rights actions would be consistent with the Supreme Court's jurisprudence in habeas cases, citing *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). A habeas petition, however, may be stayed pending exhaustion. Further, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), superseding *Rose*, specifically provides for the consideration of "mixed" exhausted and unexhausted claims. Section 2254(b)(2) provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

dering appointment of counsel to address, inter alia, "total exhaustion" rule); *see* *Nelson,* 2002 WL 31075804 at *5 (collecting cases). Some recent decisions support defendants' position. *Law v. Bergamini,* No. 01 Civ. 463(LEK)(DEP), 2003 WL 133272, *1 (N.D.N.Y. Jan. 14, 2003) (finding that the wording of the statute mandates dismissal of all claims where some are unexhausted); *Vidal v. Gorr,* No. 02 Civ. 5554(LAK), 2003 WL 43354 (S.D.N.Y. Jan.6, 2003) (same); *Saunders v. Goord,* No. 98 Civ. 8501(JGK), 2002 WL 1751341 (S.D.N.Y. July 29, 2002) (same).

Other recent decisions have come to the opposite conclusion. *Dimick v. Baruffo,* No. 02 Civ. 2151(LMM), 2003 WL 660826, *5 (S.D.N.Y. Feb.28, 2003) (allowing exhausted claims to be severed from unexhausted claims, noting that "Congress did not intend the PLRA to be a minefield" for imprisoned litigants and that, where a court may "easily sever unexhausted claims, leaving a possibly valid suit, it should do so"); *Nelson,* 2002 WL 31075804, at *5 (addressing merits of exhausted claims while dismissing unexhausted claims without prejudice).

 In the circumstances of this case, a requirement of "total" or "complete" exhaustion does not make sense. The case was filed in 1999, and the exhaustion issue was not raised until several years into the litigation. Discovery is complete and the summary judgment motion is before the Court. At least one of the exhausted claims—denial of medical care—can easily be severed. Accordingly, I consider the exhausted claim against the medical defendants. At this time, I decline to consider the remaining exhausted claim against Nagy, however, both because the issues have not been briefed and the claim is related to other, unexhausted claims that are dismissed without prejudice.

## B. *The Merits*

Two claims are exhausted: the claims against the medical defendants and the retaliation claim against Nagy based on the 1999 proceedings.

### 1. *The Medical Defendants*

Rivera alleges that the medical defendants' failure to treat the severe pain, swelling, migraine headaches, and other TMJ symptoms he suffered after dental surgery constituted deliberate indifference to his medical needs in violation of the Eighth Amendment.

Defendants do not dispute that Rivera satisfies the first prong of the deliberate indifference standard. (Def. Mem. at 8 ("defendants do not dispute that plaintiff's alleged ailments in his complaint ... constitute a sufficiently 'serious medical need' ")). Therefore, the only issue remaining is whether defendants knew of and disregarded an excessive risk to Rivera's health.

### a. *Defendant Frattellone*

 The parties dispute whether Rivera consented to the surgery of February 19, 1997. Rivera asserts that Frattellone was scheduled to extract a tooth and instead performed a different procedure. Defendants assert that Rivera himself informed Frattellone that the tooth had already been extracted and agreed to an excision of tissue instead. Assuming that Frattellone performed the excision despite informing Rivera that a tooth was to be extracted, no reasonable jury could find that Frattellone's choice of treatment created an excessive risk to Rivera's health.

I assume, for purposes of this motion, that Frattellone's conduct was negligent and that, indeed, he committed medical malpractice. (Rivera Aff. ¶ 15 (alleging that his "infection was caused by the negligent acts of Frattellone")). But negli-

gence alone is not enough for an Eighth Amendment violation. *Hathaway*, 37 F.3d at 66 (noting "[d]eliberate indifference requires more than negligence"); *see Chance*, 143 F.3d at 703 (finding that malpractice may rise to an Eighth Amendment violation only where it "involves culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces a 'conscious disregard of a substantial risk to serious harm'" (citation omitted)); *see also Estelle*, 429 U.S. at 102, 105, 106, 97 S.Ct. 285 (finding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," and that the alleged conduct "must be repugnant to the conscience of mankind" or "incompatible with 'the evolving standards of decency that mark the progress of a maturing society'" (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958))). No reasonable jury could conclude that Frattellone was deliberately indifferent to Rivera's needs in performing the procedure or that he consciously disregarded a substantial risk of serious harm to Rivera.

Frattellone consulted an x-ray prior to performing the procedure. (*See* Frattellone Aff. ¶ 6; *see also* Pl. Resp. Ex. A–1 ¶ 4 (speculating that, if Frattellone did examine a pre-operative x-ray, he neglected to remove all infected tissue)). Frattellone then took a new x-ray before closing the incision to confirm, by comparison with the pre-operative x-ray, that he had removed the infected tissue. (Frattellone Aff. ¶ 8). Except for the fact that Rivera later contracted a severe infection, Rivera offers no evidence to suggest any particular problem with the procedure Frattellone performed. Indeed, Rivera's medical records reflect a history—even before the procedure and as far back as 1993—of infection in his left cheek and left jaw. (AHR 12/6/93 & 2/14/94; AHR 12/22/94 & 1/5/95).

Nor does Frattellone's choice of procedure give rise to an Eighth Amendment violation by itself. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Hence, summary judgment is granted in favor of defendants dismissing the Eighth Amendment claim against Frattellone. To the extent Rivera has a medical malpractice claim against Frattellone, he must pursue whatever state court remedies are available to him.

**b.** *The Remaining Medical Defendants*

 As to the remaining medical defendants, no reasonable jury could conclude on the record before the Court that these defendants knew of and disregarded an excessive risk to Rivera's health.

The undisputed evidence shows that Rivera was frequently examined and treated for various conditions by a total of 21 different doctors. Rivera was sent to several specialists as well as three outside facilities. He received pain medication on a regular basis. He acknowledges that Green Haven medical staff listened to his complaints, provided him with medical care, and routinely tested him for various ailments. Of course, Rivera was sometimes turned away and on occasion the medical defendants refused to see or treat him, but this was usually because they believed his issues were related to his dental problems and they felt he should be referred for dental treatment. In the totality of the circumstances, no reasonable jury could find that these refusals or delays resulted in a constitutional deprivation. *Rodriguez v. Mercado*, No. 00 Civ.

8858(JSR)(FM), 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (noting that "[a] delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights"); *Amaker v. Coombe,* No. 96 Civ. 1622(JGK), 2002 WL 523388, at *8 (S.D.N.Y. Mar.29, 2002) (finding that an actionable "delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment"). Indeed, here Rivera's condition was intractable and difficult to treat.

In addition, Rivera refused medical treatment on more than one occasion. Evidence that a plaintiff has refused medical care has been found to "effectively rebut[ ] ... claim[s] of deliberate indifference to serious medical needs." *Nelson,* 2002 WL 31075804, at *16; *see, e.g., Brown v. Selwin,* 98 Civ. 3008(RMB), 1999 WL 756404 at *6–7 (S.D.N.Y. Sept. 24, 1999) (granting summary judgment to defendants where plaintiff's medical condition resulted from his refusal to allow doctors to remove stent); *cf. Ruffin v. Deperio,* 97 F.Supp.2d 346, 355 (W.D.N.Y.2000) (denying plaintiff's motion for summary judgment because defendants raised issue of material fact regarding plaintiff's noncompliance with medical regime).

Accordingly, no reasonable jury could conclude that the medical defendants were deliberately indifferent to Rivera's medical needs. Summary judgment is therefore granted dismissing the claims against them.

### 2. *The 1999 Retaliation Claim Against Nagy*

 Rivera alleges that, in retaliation for his filing of this lawsuit with Nagy as a defendant, Nagy deliberately adjourned a disciplinary hearing in July 1999 to continue Rivera's detention in pre-hearing keep-lock confinement for two days longer than generally permitted under the regulations. Rivera alleges that Nagy then conducted the hearing in a biased manner, preventing Rivera from presenting his defense. At the hearing, Rivera called, as witnesses, two corrections officers who testified that they did not see Rivera engaging in the alleged wrongful conduct. (Am. Compl.¶¶ 102, 106). Nagy subsequently found Rivera guilty of two of the four charges listed in the misbehavior report, those of creating a disturbance and harassment. (Rivera Supp. Aff. Ex. E (Disciplinary Hearing Disposition)). Rivera was sentenced to 30 days confinement with loss of privileges. (Am.Compl.¶ 106).

Defendants have not moved for summary judgment on the merits of this claim, as they have relied exclusively on the exhaustion argument. Rivera's conduct—the filing of this lawsuit—was protected by the First and Fourteenth Amendments. As the authorities discussed above make clear, a reasonable jury could find that a sentence of 30 days confinement with a loss of privileges was more than de minimis. It is not clear, however, whether Rivera has presented sufficient evidence to raise a question of fact as to whether Nagy retaliated against him for bringing this lawsuit. Because the defendants relied solely on nonexhaustion, Rivera has not been called upon to submit evidence to support this claim, and the issue is not ripe for summary judgment on the merits.

Nonetheless, the motion for summary judgment must be granted, for this claim—unlike those against the medical defendants—is not "easily sever[able]" from Rivera's other unexhausted excessive force and retaliation claims. *Dimick,* 2003 WL 660826 at *5. The claim is dismissed without prejudice to refiling after Rivera concludes his efforts to exhaust these related claims.

### C. *Qualified Immunity*

I do not address the issue of defendants' qualified immunity defense as the issue is moot as to the claims against the medical defendants and it is premature as to the other claims.

### CONCLUSION

In sum, the motion for summary judgment is granted as follows:

1. Rivera's claims against the medical defendants are dismissed, with prejudice, on the merits;

2. Rivera's excessive force claim against Kelly, Belton, and Brady is dismissed without prejudice for failure to exhaust;

3. Rivera's retaliation claim against Meyer is dismissed without prejudice for failure to exhaust;

4. Rivera's retaliation claim against Nagy based on the 1997 proceedings is dismissed without prejudice for failure to exhaust; and

5. Rivera's retaliation claim against Nagy based on the 1999 proceedings is exhausted; however, because the claim overlaps the unexhausted claim alleging retaliation by Nagy against Rivera in the 1997 disciplinary proceeding, this claim is also dismissed without prejudice to refiling after Rivera's exhausts his related claims.

If Rivera wishes to proceed with the unexhausted claims, he must file grievances with DOCS within 14 days after receipt (by his counsel) of this opinion. If he does so and DOCS refuses to consider the grievances on the merits, Rivera may return to this Court to argue that he is entitled to present his claims to this Court on the merits because he has exhausted all available administrative remedies. If he succeeds on that argument, he will be permitted to pursue his claims on the merits in this Court.

If Rivera elects not to pursue the unexhausted claims, his counsel shall advise the Court and he will be permitted to proceed with the retaliation claim against Nagy based on the 1999 proceedings.

The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.