**Harold SCOTT, Plaintiff,**

v.

**Lt. G. GARDNER, et al., Defendants.**

**No. 02 Civ.8963(RWS).**

United States District Court,
S.D. New York.

Oct. 31, 2003.

Harold J. Scott, Great Meadow Correctional Facility, Comstock, NY, Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of New York State, New York, NY (Steven N. Schulman, Assistant Attorney General, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants Lieutenant G. Gardner ("Gardner"), Lieutenant Longobardo ("Longobardo"), Sergeant James Dunn ("Dunn"), Correction Officer D. Young ("Young"), Robert H. Kuhlman ("Kuhlman"), Dr. Lee ("Lee"), Director Donald Selsky ("Selsky") have moved under Fed. R.Civ.P. 12(b)(6) to dismiss the complaint of *pro se* plaintiff Harold Scott ("Scott"), on the grounds that Scott has failed to exhaust his administrative remedies, that Scott's claim is barred by the statute of limitations, that the defendants have qualified immunity and that Scott has failed to state a claim upon which relief can be granted.

For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

### Parties

Scott is a prison inmate in Department of Correctional Services ("DOCS") custody and was incarcerated at Sullivan Correctional Facility ("Sullivan") when the events complained of began. Scott is currently incarcerated in Great Meadow Correctional Facility in Comstock, New York.

Gardner is an employee of DOCS assigned to Sullivan at all relevant times.

Dunn is an employee of DOCS assigned to Sullivan at all relevant times. Dunn was responsible for supervising the urinalysis program at Sullivan.

Longobardo is an employee of DOCS assigned to Sullivan at all relevant times.

Young is an employee of DOCS assigned to Sullivan at all relevant times.

Kuhlman was the Superintendent of Sullivan at all relevant times.

Selsky is DOCS Director of Special Housing/Inmate Disciplinary Program.

Lee was at all relevant times an employee of the Office of Mental Health (OMH) assigned to the Sullivan Psychiatric Satellite Unit.

John Doe # 1 is the Psychiatric Unit Chief at Sullivan and is an OMH employee.

John Doe # 2 is the Classification Analyst in the Albany DOCS Division of Classification and Movement.

Jane Doe is an OMH social worker.

### Prior Proceedings

In 1990 Scott commenced a federal action in the Southern District of New York alleging that the discipline he received in connection with the possession of a shank and refusing to make a court appearance violated his rights. The case arose out of incidents which occurred in Green Haven Correctional Facility in the 1980's. The only common defendant with this case is Selsky. In *Scott v. Coughlin*, 78 F.Supp.2d 299 (S.D.N.Y.2000), the Court denied in part and granted in part the defendants' motion for summary judgment. The case was settled in January 2000.

On November 12, 2002, Scott filed the complaint in the present action, alleging, *inter alia*, that defendants retaliated against him for pursuing the prior litigation by subjecting him to multiple urine tests, an illegal disciplinary proceeding, unwanted mental health treatment and a sanction in the Special Housing Unit (SHU) of Fishkill Correctional Facility.

Defendants moved to dismiss the action on May 12, 2003. After submission of briefs, the matter was deemed fully submitted on September 3, 2003.

### Facts

The following facts are drawn from Scott's complaint, Rule 56.1 statement and accompanying exhibits, and do not constitute findings of fact by the Court.

Scott was subjected to numerous urine tests. These tests occurred at Sullivan on September 11, 1998, September 19, 1998, January 18, 1999 and February 20, 1999 by Longobardo, March 9, 1999 by Gardner and March 13, 1999 and March 26, 1999 by Young. Following his transfer to Fishkill Correctional Facility ("Fishkill"), Scott was given a urine test by non-defendant Correction Officer Bennett. After transfer to Great Meadow Correctional Facility ("Great Meadow"), Scott was tested on June 24, 1999, September 5, 1999, November 24, 1999, December 22, 1999 and January 11, 2000. Scott does not allege that any defendant participated in the tests at Great Meadow.

Scott also alleges that on October 30, 1998, OMH ordered him to report to the Psychiatric Satellite Unit at Sullivan. Scott was referred to OMH by John Doe # 1 because he was complaining that the actions of corrections officers were causing anxiety. Scott was interviewed by an OMH social worker, identified as Jane Doe, who advised him that he would have to receive therapy every two to three weeks and would be admitted to the Central New York Psychiatric Center if he refused. Dr. Lee allegedly made similar threats. Scott was classified as "delusional" by OMH and his OMH mental health level was changed to indicate that he had mental health issues. Scott reported for therapy until he was transferred on April 1, 1999.

Scott alleges that the March 13, 1999 urine test was taken by Young, who had made comments critical of Scott's legal actions. Scott alleges that Young mishandled that sample, which tested positive for opiates. Sergeant Dunn performed a confirmatory test which was also positive. After confirming with a nurse that Scott was not prescribed any opiates, Dunn issued a misbehavior report initiating disciplinary charges for illicit drug use.

On March 19, 1999, a hearing was held before Lt. Longobardo. Scott raised objections to the testing process and to the evidence received at the hearing. Longobardo found Scott guilty and imposed 180 days of keeplock confinement, of which 60 days were suspended, in addition to 365 days loss of package, commissary and telephone privileges, of which 180 days were suspended. On April 8, 1999, Scott appealed the sanction to Director Selsky, who reviews disciplinary proceedings at the departmental level. On May 19, 1999, Selsky modified the sanction to 90 days keeplock plus 180 days loss of package, commissary and telephone privileges. Scott alleges that he served a total of 90 days confinement.

Scott filed an Article 78 petition for review in the Supreme Court of New York for Albany County. In the course of the litigation, Scott was served with a computer printout which showed that the March 13, 1999 urine test, which had led to the sanctions, was conducted under suspicion, rather than randomly as previously claimed. On January 18, 2000, Scott wrote to Selsky, bringing the computer printout to his attention. On February 7, 2000, Selsky reversed the sanctions and ordered that the record of the disciplinary proceedings be expunged.

On March 23, 1999, Scott asked Gardner why he had been subjected to frequent urine tests. Scott alleges that in response,

Gardner initiated a transfer to a facility further from New York City, apparently in cahoots with John Doe # 2, the DOCS classification analyst who allowed the transfer to proceed.

On April 1, 1999, Scott was transferred first to Downstate Correctional Facility and then to Fishkill. On arrival at Fishkill, Scott was placed in the Special Housing Unit (SHU) in a double cell, rather than keeplock. Scott filed a grievance protesting serving a keeplock sanction in SHU, which was ultimately denied. On June 16, 1999, Scott was transferred to Great Meadow, in upstate New York.

Scott filed two grievances at Sullivan and three grievances at Fishkill which were appealed to the Central Office Review Committee (CORC). Of the two grievances at Sullivan, one related to the postage for insurance and the other related to doublecelling. Of the grievances at Fishkill, one related to the issuance of soap, one related to a request for a single cell, and one alleged that he was placed in SHU rather than keeplock upon arrival at the facility. CORC sustained the superintendent's decision on the latter grievance denying the grievance on May 12, 1999.

### Discussion

In addressing the present motion, the Court is mindful that the plaintiff is proceeding *pro se* and that his submissions should be held to "less stringent standards than formal pleadings drafted by lawyers ..." *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (*quoting Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *see also Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir.1993). Indeed, district courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir.1999) (*quoting Burgos v.*

*Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law. *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir.1983) (quotations omitted).

■ To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) defendants acted under "color of state law" (2) to deprive plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Shabazz v. Vacco*, No. 97 Civ. 3761, 1998 WL 901737, at *2 (S.D.N.Y. Dec.28, 1998) (*citing Pitchell v. Callan*, 13 F.3d 545, 547–48 (2d Cir.1994)); *see also Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). An individual defendant is not liable under § 1983 absent personal involvement. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994); *Morris v. Eversley*, 205 F.Supp.2d 234, 241 (S.D.N.Y.2002). Generally, to withstand a motion to dismiss, a § 1983 complaint must set forth specific factual allegations indicating a deprivation of constitutional rights. *Shabazz*, 1998 WL 901737, at *2; *see Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir.1987) ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983.").

### A. Exhaustion

■ The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), states that:

No action shall be brought with respect to prison conditions under section 1983 ... or any other federal law ... by a prisoner ... until such administrative remedies as are available are exhausted.

Complaints filed under § 1983 are to be dismissed if prisoners have failed to exhaust administrative remedies. *Booth v.*

*Churner,* 532 U.S. 731, 742, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *Alexandroai v. California Dep't of Corrections,* 985 F.Supp. 968, 970 (S.D.Cal.1997) (plaintiff must "work within the prison system to have his case heard and then come to the Court after he has exhausted his administrative remedies as required by federal law"). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

### *Failure to Exhaust Administrative Remedies Does Not Deprive the Court of Jurisdiction*

In previous opinions, this Court has held that the failure to exhaust administrative remedies under the PLRA deprives a court of jurisdiction. *See Cole v. Miraflor,* No. 02 Civ. 9981, 2003 WL 21710760, at *1 (S.D.N.Y. July 23, 2003); *Sulton v. Wright,* 265 F.Supp.2d 292, 296 (S.D.N.Y.2003). This conclusion is consistent with a number of courts in this district. *See, e.g., Harris v. Totten,* 244 F.Supp.2d 229, 231 (S.D.N.Y.2003) (noting that exhaustion raises a "challenge to the court's jurisdiction"); *Paulino v. Amicucci,* No. 02 Civ. 208, 2003 WL 174303, at *2 (S.D.N.Y. Jan.27, 2003) (same); *Benitez v. Straley,* No. 01 Civ. 0181, 2002 WL 31093608, at *2 (S.D.N.Y. Sept. 18, 2002) (same) (adopting magistrate's report but modifying reasoning to determine "challenge to the court's jurisdiction" instead of Rule 12(b)(6)).

The Second Circuit, however, has recently held that "failure to exhaust administrative remedies is not a jurisdictional predicate" under the PLRA. *Richardson v. Goord,* 347 F.3d 431, —— (2003).

### *Defendants' Motion to Dismiss Is Converted to a Motion for Summary Judgment*

■ Because the PLRA's exhaustion requirement does not implicate the Court's jurisdiction, the defendants' 12(b)(1) motion will not be considered. The issue of nonexhaustion should, however, "be resolved as early as possible by the court." *McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003) (*citing Perez v. Wis. Dep't of Corr.,* 182 F.3d 532, 536 (7th Cir.1999)). It is questionable, however, whether the issue of Scott's exhaustion of his remedies is appropriately decided on a motion to dismiss under Rule 12(b)(6), as defendants have requested.

■■ On a Rule 12(b)(1) challenge to subject matter jurisdiction, a court may consider matters outside the complaint. *Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir.2002) (*citing United States v. Vazquez,* 145 F.3d 74, 80 (2d Cir.1998)). Under a Rule 12(b)(6) motion, however, review must be limited to the complaint and documents attached or incorporated by reference thereto. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir. 1991). While Scott has attached certain documents to his complaint, they are not sufficient to resolve the nonexhaustion issue. Defendants, recognizing this fact, have submitted documents in order to establish that Scott has failed to exhaust his administrative remedies as to some of his claims. On a Rule 12(b) motion, when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment," and the parties must be given a reasonable opportunity to present all "pertinent" materials. Fed.R.Civ.P. 12(b).

■ It is true that, "in practice, courts routinely consider extrinsic material on a motion to dismiss for nonexhaustion,

without first requiring conversion pursuant to Rule 12(b) or (c)." *McCoy*, 255 F.Supp.2d at 250 (citing cases). Further, a court may consider documents attached to a movant's papers in circumstances where such materials are "integral to [plaintiff's] claims and [plaintiff] had notice of that information." *Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir. 2000). In the context of a *pro se* complaint, a court may also consider some extrinsic material. *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001) (considering *pro se* plaintiffs' allegations in an affidavit submitted to EEOC as an integral part of her pleadings). However, as the court in *McCoy* noted:

> This practice is in keeping with the liberality afforded to the pleadings of *pro se* plaintiffs and is usually done for a *pro se* plaintiff's benefit; it is not clear that such incorporated materials may be used to support the *dismissal* of a *pro se* complaint.

*McCoy*, 255 F.Supp.2d at 250 (emphasis in original).

As the *McCoy* court recognized, conversion of a 12(b)(6) motion to a summary judgment motion "could undermine the goals of the exhaustion requirement" by creating "delay and expenditure of resources." *Id.* However, the Second Circuit does not sanction the kind of middle ground in use in the Ninth Circuit, which treats "the failure to exhaust nonjudicial remedies … as a matter in abatement, which is subject to an unenumerated Rule 12(b) motion rather than a motion for summary judgment." *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir.2003). On such motions, a court "may look beyond the pleadings and decide disputed issues of fact." *Id.* at 1120. Such motions are permitted "based on the general principle that summary judgment is on the merits, whereas dismissal of an action on the

ground of failure to exhaust administrative remedies is not on the merits." *Id.* at 1119 (quotations and citations omitted).

■ The argument in *McCoy* is persuasive that the failure to exhaust defense "ought to be decided in the same way" as "the defenses of lack of subject matter jurisdiction, lack of personal jurisdiction, and insufficient service of process," allowing courts to consider matters outside the pleadings in deciding these motions. 255 F.Supp.2d at 251. However, because the Second Circuit has not adopted the Ninth Circuit's approach, the Court follows the *McCoy* court in holding that:

> If nonexhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted.
>
> If nonexhaustion is not clear from the face of the complaint, a defendant's motion should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.

*Id.* As nonexhaustion is not clear from the face of Scott's complaint, the motion is converted to one for summary judgment only to consider the nonexhaustion issues. Defendants' remaining arguments that Scott fails to state a claim will be considered under the Rule 12(b)(6) standard.

■ The motion may not be converted to one for summary judgment, however, unless Scott has been given "unequivocal notice" of his obligation to submit evidentiary materials and an opportunity to do so. *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir.1983). It is clear that Scott has been given both notice and

an opportunity. First, defendants moved to dismiss on the exhaustion issue, among others, and Scott responded to the issue in detail. Second, defendants served on Scott a notice stating that they have submitted "matters which may be regarded by the Court as outside the pleading," that the motion may be converted by the Court to a motion for summary judgment, and that in opposing summary judgment, "you must submit evidence, such as witness statements or documents, countering the facts asserted by the defendants and raising issues of fact for trial." Def. Local Rule 12.1 Notice to Pro Se Litigant Opposing Motion to Dismiss Treated As Motion for Summary Judgment. In response, Scott treated the defendants' motion as one for summary judgment, submitting numerous documents and a Rule 56.1 statement. Because Scott received adequate notice, the motion will be converted to one for summary judgment on the exhaustion issue.

### On a Motion for Summary Judgment, the Court Must First Consider the Exhaustion Question as to Each Claim

 Defendants argue that the Court has the discretion to dismiss the entire action or individual claims on the merits, regardless of the disposition of the exhaustion question. According to 23 U.S.C. 1997e(c)(2):

> In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without requiring the exhaustion of administrative remedies.

Such a resolution would save the trouble of negotiating the thicket of jurisprudence on the issue of exhaustion under the PLRA. However, "[w]hereas the PLRA requires dismissal for failure to state a claim without requiring exhaustion, no such authorization exists for a grant of summary judgment." *McCoy*, 255 F.Supp.2d at 252; *see also Rivera v. Goord*, 253 F.Supp.2d 735, 745–46 (S.D.N.Y.2003) (same); *Rodriguez v. Ghoslaw*, No. 98 Civ. 4658, 2002 WL 1424586 (S.D.N.Y. June 28, 2002) (considering exhaustion issue on remand from the Second Circuit after grant of summary judgment to defendants despite the Second Circuit's agreement with district court that all of plaintiff's claims were without merit); *but see Hayes v. Berghuis*, 40 Fed. Appx. 18, 20 (6th Cir.2002) (unpublished case) (upholding grant of summary judgment on the merits and citing § 1997e(c)(2) for proposition that "exhaustion is not necessary because Hayes failed to state a claim for relief against these particular defendants."). Although the Second Circuit has not explicitly stated that a court may not "dismiss the underlying claim" on a grant of summary judgment, the better course of action is first to consider the exhaustion issue.

### Total Exhaustion is Not Required

Although defendants concede that Scott has exhausted his administrative remedies as to some of his claims, they argue that Scott's entire complaint should be dismissed because he has failed to exhaust some of his claims. The question of whether "total exhaustion" is required is currently unsettled in this Circuit. *See Ortiz v. McBride*, 323 F.3d 191, 195 (2d Cir.2003) (noting the split within the Circuit and that briefing has been ordered on the issue).

Defendants cite numerous courts in this District that have dismissed the entire complaint when there are unexhausted claims. *See e.g.*, *Rivera v. Pataki*, No. 01 Civ. 5179, 2003 WL 21511939, at *8 (S.D.N.Y. July 1, 2003) (dismissing the entire complaint without prejudice, giving the

plaintiff "an opportunity to plead [all claims] again if he chooses to do so"); *Vidal v. Gorr*, No. 02 Civ. 5544, 2003 WL 43354 (S.D.N.Y. Jan.6, 2003); *Saunders v. Goord*, No. 98 Civ. 8501, 2002 WL 1751341, at *3 (S.D.N.Y. July 29, 2002). Defendants note that 42 U.S.C. § 1997e(a) provides that "no action shall be brought" prior to exhaustion, not "no claim shall be brought." *See Saunders*, 2002 WL 1751341, at *3 (holding that "the plain language of 42 U.S.C. § 1997e(a)" dictates total exhaustion). Defendants also argue that total exhaustion best furthers the purpose of the PLRA to avoid piecemeal litigation. *See Rivera v. Whitman*, 161 F.Supp.2d 337, 342 (D.N.J.2001). Defendants also argue that "[b]ecause a rule of total exhaustion requires inmate plaintiffs to buy a new index number, it provides them with an incentive to use the prison grievance process with respect to all of their potential claims before coming to Court." Def. Mem. at 13.

Several courts in this district have either rejected total exhaustion or proceeded to examine the merits of unexhausted claims without considering the issue. *See e.g., Rivera v. Goord*, 253 F.Supp.2d 735, 749, 753–54 (S.D.N.Y.2003); *Hattley v. Goord*, No. 02 Civ. 2339, 2003 WL 1700435 (S.D.N.Y. Mar.27, 2003) (Ellis, M.J.); *Dimick v. Baruffo*, No. 02 Civ. 2151, 2003 WL 660826, at *5 (Feb. 28, 2003); *Samuels v. Selsky*, No. 01 Civ. 8235, 2002 WL 31040370, at *10 (S.D.N.Y. Sept.12, 2002).

In reviewing the decisions of district courts in other circuits, the *Hattley* court has provided the most extensive review to date of the arguments for and against total exhaustion. *See Hattley*, 2003 WL 1700435, at *4–*7. In addition to the arguments made by the defendants, some courts have also argued by analogy to the habeas corpus context that total exhaustion promotes comity, arguing that,

under the principles of comity, prison officials should have a full opportunity to address claims raised by prisoners before they are brought to federal court. By requiring total exhaustion, the federal courts will not only promote comity, but reap the benefits of more focused complaints and more developed evidentiary records.

*Id.* at *6 (*quoting Smeltzer v. Hook*, 235 F.Supp.2d 736, 745 (W.D.Mich.2002)).

Courts making the case against total exhaustion also refer to the language of § 1997e(a), arguing that the phrase "no action shall be brought" does not compel the court either to dismiss the claims altogether or to considering the merits of the exhausted claims. *Id.* (*citing Jenkins v. Toombs*, 32 F.Supp.2d 955, 957 (W.D.Mich. 1999)). Further, "nothing in the legislative history of the statute indicate[s] that Congress intended a total exhaustion requirement." *Id.* (*citing Jenkins*, 32 F.Supp.2d at 958; *Johnson v. True*, 125 F.Supp.2d 186, 188 (W.D.Va.2000)). There are significant differences between habeas actions and prisoner civil rights actions. The *Jenkins* court argues that:

While exhaustion in prisoner civil rights actions is meant primarily as a docket management strategy, exhaustion in habeas cases is intended to promote comity by protecting the state courts' role in the enforcement of federal law and preventing disruption of state judicial proceedings, to ensure factual development through evidentiary hearings within the state courts, and to avoid the problem of exhausted an unexhausted claims based on intermingled facts and the resulting temptation to resolve unexhausted claims which are tightly linked to exhausted claims.

Even if these policies applied to prisoner civil rights actions, they would not favor adoption of a total exhaustion re-

quirement. First, there is no comity issue involved in prisoner civil rights actions, since prisoners are not required to press their claims in state courts and prison administrators generally limit their review to determining whether prison policy has been violated. Second, the administrative remedies developed by prisons may not involve evidentiary hearings of the type that are held in state courts. Third, resolving all of a prisoner's civil rights claims together may be less important, since the claims raised in a single complaint are less likely to deal with interrelated or intermingled factual issues than the claims raised in habeas petitions.

*Jenkins,* 32 F.Supp.2d at 959.

District courts finding no total exhaustion requirement have also expressed doubts as to the efficiency of such a procedure. Given the short period of time allotted to prisoners to file grievances, *see e.g., Woodrich v. Greiner,* No. 01 Civ. 7892, 2003 WL 22339264, at *2 (S.D.N.Y. Oct.10, 2003) (an inmate in a New York state prison must file his or her grievance within fourteen days of the alleged grievance), "a prisoner may not be able to raise or resolve unexhausted claims within state and local institutions." *Jenkins,* 32 F.Supp.2d at 959; *see also Cole,* 2003 WL 21710760, at *2 (holding that by failing to file grievance within the appropriate time period, prisoner had failed to exhaust administrative remedies). As a result,

> prisoners are likely to simply amend their complaints to eliminate the unexhausted claims and refile. In that case, courts would be faced with exactly the same claims they could have resolved at the outset.

*Id.* Because the PLRA now requires prisoners filing *in forma pauperis* to "pay the full amount of a filing fee", 28 U.S.C. 1915(b)(1),[1] such a requirement may be "unduly punitive" and "may amount to nothing more than a monetary penalty against the prisoner." *Jenkins,* 32 F.Supp.2d at 959. Defendants argue that far from being punitive, this requirement "provides a disincentive against trying to combine unexhausted with exhausted claims." Def. Mem. at 13.

■■■ Considering the arguments arrayed on both sides, the Court concludes that a total exhaustion requirement is not mandated by the language of § 1997e(a). Most persuasive is the practical argument advanced in *Hattley* that "dismissing the entire complaint does little to further any goal of the PLRA identified by the parties or the courts, since the complaint can simply be refiled and contain the exact same issues the court could have resolved had it dismissed only the unexhausted claims." 2003 WL 1700435, at *7. After determining which of Scott's claims are unexhausted, the merits of the remaining claims will be examined.

### *Scott Has Not Exhausted His Administrative Remedies as to Any of the Allegedly Retaliatory Urine Tests*

■■■ Defendants argue that no aspects of Scott's causes of action relating to the allegedly retaliatory urine tests have been subject to administrative review. Scott replies that he filed numerous complaints with the DOCS administration regarding the tests. Letters of complaint, regardless of the addressee, are not part of the grievance process and do not satisfy the exhaustion requirement. *See Hemphill v. New York,* 198 F.Supp.2d 546, 549

---

1. The fee for a filing a new action in the Southern District of New York is currently $150.

(S.D.N.Y.2002) ("The remedies afforded an aggrieved prisoner are clear, and prisoners have no authority or ability to invent their own grievance procedures."); *Beatty v. Goord*, 210 F.Supp.2d 250, 255–56 (S.D.N.Y.2000) ("Permitting Plaintiff to bypass the Inmate Grievance Program, as he chooses, would undermine the important objective of creating an efficient and effective prison grievance mechanism.").

Scott argues that he could not grieve the repeated urine tests as they did not exceed the DOCS authorized limits for random testing under the former 7 N.Y.C.R.R. § 1020.4(a)(3), which permitted no more than five random tests in a twelve-month period. However, inmates may take advantage of an expedited grievance process when complaining of any alleged "employee misconduct meant to annoy, intimidate or harm an inmate." 7 N.Y.C.R.R. § 701.11(a). Scott could have grieved each urine test under this procedure.

Scott also argues that he challenged the repeated urine tests in his disciplinary hearing and in the administrative appeal of that hearing. Although completion of the disciplinary appeal process may satisfy the exhaustion requirement with respect to Scott's claims that he was denied due process in the disciplinary proceedings, allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved. *See McCoy*, 255 F.Supp.2d at 256 ("An appeal of the disciplinary hearing determination does not satisfy the PLRA's exhaustion requirement."); *Cherry v. Selsky*, No. 99 Civ, 4636, 2000 WL 943436, at *6–7 (S.D.N.Y. July 7, 2000) (same).

■ Scott further argues that "after the United States Supreme Court ruled that exhaustion was mandatory in 2002," he revisited the DOCS grievance process, but his attempts to grieve the urine tests were rejected. All of Scott's 2002 grievances related to the urine tests were re-

jected as untimely, as the last of tests took place in January 2000. "Failure to file a timely grievance constitutes failure to exhaust administrative remedies as required by the PLRA." *Cole*, 2003 WL 21710760, at *2; *see also Long v. Lafko*, 254 F.Supp.2d 444, 447 (S.D.N.Y.2003) (same); *Patterson v. Goord*, No. 20 Civ. 759, 2002 WL 31640585 (S.D.N.Y. Nov.21, 2002) (same). Further, Scott's contention that the Supreme Court's decision in *Porter v. Nussle*, 534 U.S. 516, 522, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), requiring exhaustion of all inmate claims, should not be applied retroactively is incorrect. *See Webb v. Goord*, 340 F.3d 105, 112 (2d Cir.2003) ("Our Circuit has already applied *Porter* retroactively ... and we see no reason not to do so here.") (*citing Lawrence v. Goord*, 304 F.3d 198, 200 (2d Cir.2002)).

Scott argues that he did not file grievances with respect to the urine tests because his complaints were informally resolved when Selsky ultimately expunged his record and the urine tests stopped. The Second Circuit has noted that informal resolution may satisfy the exhaustion requirement. *See Ortiz*, 323 F.3d at 194 ("[U]nder the administrative scheme applicable to New York's prisoners, resolution of an inmate's grievances through informal channels may satisfy the exhaustion requirement."); *Marvin v. Goord*, 255 F.3d 40, 43 n. 3 (2d Cir.2001) (per curiam). The Inmate Grievance Program (IGP) regulations state that "[t]he inmate grievance program ... is intended to supplement, not replace, existing formal or informal channels of problem resolution." 7 N.Y.C.R.R. § 701.1(a). It would therefore be improper to insist on the IGP as the only means of exhaustion.

Defendants argue that the Second Circuit's language in *Ortiz* and *Marvin* is dicta and that it would contradict the Supreme Court's holding in *Booth v. Chur-*

*ner*, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958, rejecting all equitable exceptions to the exhaustion requirement. Defendant misread the language of the Second Circuit, which raises the possibility the informal resolution may *satisfy* the exhaustion requirement, rather than excusing it.

Defendants also argue that "Congress did not intend to measure completion of the administrative process by self-serving declarations of satisfaction of prisoner complaints." Def. Reply. Mem. at 3; *see also Porter*, 534 U.S. at 530, 122 S.Ct. 983 ("[i]t seems unlikely that Congress, when it included in the PLRA a firm exhaustion requirement, meant to leave the need to exhaust to the pleaders' option.") (citations omitted). Defendants also cite *Dixon v. Goord*, 224 F.Supp.2d 739 (S.D.N.Y.2002) in support of their argument. While *Dixon* does state that "[a]llowing [plaintiff] to bring his claims after they were redressed internally would negate the purpose of the PLRA and would be unnecessarily duplicative," the decision does not support defendants' argument. *Id.* at 751. *Dixon* held that informal resolution is sufficient to exhaust administrative remedies, stating that:

> If a grievance has been satisfied, a review board would not have the power to act upon the complaint; therefore, [plaintiff] need not have exhausted the administrative process for complaints he concedes were already redressed.

*Id.* at 750. The first quotation from *Dixon* is in support of the proposition that a plaintiff may not recover damages for any injuries alleged to have been suffered after his grievances have been addressed. *Id.* at 751.

The option of construing informal resolution as exhaustion serves to address the fact that the remedies available in federal court differ from those available through the inmate grievance process. The fact that a plaintiff who suffers a wrong and then complains informally may receive all satisfactions available within the prison system does not mean that the plaintiff is not also entitled to damages or other remedies available in federal court.

However, if informal resolution is to be construed as satisfying the exhaustion requirement, the process of seeking resolution must begin within the time within which an inmate must bring a formal grievance, that is, fourteen days. Scott cannot otherwise argue that informal resolution precluded the filing of a formal grievance. It is not sufficient to allege resolution at a later date, even if there is evidence to support it, because a resolution achieved after the allotted time for a formal grievance cannot be used to demonstrate that the grievance was held but not expressed at that time. Either Scott received satisfaction within fourteen days, or a formal grievance should have been filed.

Scott argues that his concerns over the urine tests were resolved when he brought the fact that his urine tests were conducted under suspicion to the attention of Selsky on January 18, 2000, and Selsky reversed his sanction and expunged his record on February 7, 2000. The only urine test which could have been informally resolved is the one on January 11, 2000 at Great Meadows. However, as Scott does not allege that any defendant participated in the January 11 test, that test cannot form the basis for a claim. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) ("It is well established in this Circuit that personal involvement of defendants in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Accordingly, the first cause of action is dismissed without prejudice.

*Scott Has Not Exhausted His Administrative Remedies As to DOCS Defendants Named In the Coerced Psychiatric Treatment Claim*

 Scott has filed no grievances with respect to his claim that he was subjected to psychiatric treatment against his will in retaliation for his legal actions. Scott argues that according to a Directive 4040 issued by DOCS, inmates may not grieve "OMH issues or actions" through the IGP. While that is true as to the OMH defendants, to the extent that DOCS employees participated in any alleged retaliation, their conduct would be considered harassment and is covered under the expedited grievance procedure outlined in 7 N.Y.C.R.R. § 701.11(a). Accordingly, the claims against Kuhlman and John Doe # 2 in the second cause of action are dismissed without prejudice.

*Scott Has Exhausted His Administrative Remedies As to the Retaliatory Transfer Claim*

 Scott has filed no grievances with respect to his claims that he was transferred to an upstate facility in retaliation for his legal actions. Scott alleges that he attempted to file a grievances at Fishkill and Great Meadows regarding both the repeated urine tests and the allegedly illegal transfer to Great Meadow. Scott Aff. at ¶¶ 7, 19. At both facilities the IGP Supervisor on duty refused to process and file the grievances because they alleged incidents that occurred at Sullivan that were "institutional specific" and thus not grievable at the subsequent facility. Scott Aff. ¶¶ 8–9, 19. Scott includes two documents allegedly showing that DOCS routinely prevents inmates from filing grievances at a different facilities from where the conduct occurred. Defendants counter that Scott's evidence shows only "that grievances seeking service at the old facility may be rejected as moot after transfer." Def. Reply Mem. at 7.

Defendants have put forth no evidence to counter Scott's claims that he was prevented from filing grievances regarding his allegedly retaliatory transfer. The plain language of the PLRA requires only "available" administrative remedies to be exhausted. *See* 42 U.S.C.1997e(a). "[I]f an inmate is not allowed to file a grievance by prison authorities, a question exists as to whether ... he had any available administrative remedies." *Kendall v. Kittles,* No. 03 Civ. 628, 2003 WL 22127135, at *4 (S.D.N.Y. Sept.15, 2003) (*quoting Burns v. Moore,* No. 99 Civ. 977, 2002 WL 91607, at *5 (S.D.N.Y. Jan.24, 2002)). Accordingly, Scott is found to have exhausted his administrative remedies as to the third cause of action. Because discovery has not yet taken place, defendants will be afforded an opportunity to present evidence rebutting Scott's contentions that he was not allowed to file grievances regarding his transfer.

**B. *Statute of Limitations***

*Scott's Claims Against the OMH Defendants Are Barred by the Statute of Limitations*

 The statute of limitations for civil rights actions commenced in New York under 42 U.S.C. § 1983 is the residual personal injury statute of N.Y. C.P.L.R. § 214(5) which provides that actions must be commenced within three years. *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir. 1997). The statute of limitations accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (*quoting Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir. 1980)). Where the plaintiff is a *pro se* prisoner, the clock stops running when the plaintiff delivers the complaint to prison officials for mailing to the Court. *Dory v.*

*Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). Because the complaint was dated by plaintiff March 4, 2002, any claim resting on incidents occurring before March 4, 1999 must be dismissed.

■ Scott alleges that on October 30, 1998, he was ordered to report to the Sullivan Correctional Facility Psychiatric Satellite Unit operated by OMH. Compl. ¶ 17. When he arrived at the Satellite Unit he was interviewed by defendant Jane Doe, who advised Scott that an OMH referral had been written because of his complaints of staff misconduct. *Id.* at ¶ 18. Defendant Jane Doe also informed him that unless he reported to therapy every two to three weeks, he would "be detained in the Satellite Unit and admitted to the Central New York Psychiatric Center (CNYPC) known as Marcy's crazy house." *Id.* at ¶ 19. Scott was therefore aware by the later part of 1998 not only of his alleged injury but that the injury was in retaliation for his complaints.

Scott argues that his claim is timely because he was warned by defendant Dr. Lee on March 4, 1999 that if he kept writing complaints about staff mistreatment and abuse the he would be admitted to CNYPC. *Id.* at ¶ 23. If Scott had then been transferred to CNYPC his complaint would be timely. Scott, however, had learned all he needed to know about his injury in order to file a claim when he first spoke with Jane Doe. The second cause of action as to the OMH defendants is therefore barred by the statute of limitations.

## C. *Retaliation*

### *Scott Has Stated A Claim Against Gardner and John Doe # 2 For Retaliation With Respect to His Transfer From Sullivan*

The Second Circuit has cautioned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). This is because "claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated," and because "prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Id.* Accordingly:

> To survive summary dismissal, a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing that: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

*Id.* at 492. Evidence that can lead to an inference that a causal connection exists includes:

> (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff.

*Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000) (*citing Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995)).

In his third cause of action, Scott alleges that the urine tests, the disciplinary hearing, and his transfer from Sullivan were all acts in retaliation for his litigation and for his complaints about staff misconduct. Because Scott did not exhaust his administrative remedies with respect to the urine tests in 1998 and 1999, the portion of the claim dealing with the urine

tests is dismissed without prejudice. As to the disciplinary hearing, it is clear that the hearing resulted from the positive urine test on March 13, 1999, and not from any protected activity engaged in by Scott. Accordingly, the portion of the third claim alleging that the disciplinary hearing constituted retaliation is dismissed.

■ The remainder of the claim is concerned with Scott's transfer from Sullivan on April 1, 1999. Although Scott names several defendants in the third cause of action, only Gardner and John Doe # 2 are alleged to have been personally involved in Scott's transfer from Sullivan. The other defendants are therefore dismissed as to the third cause of action.

The arguments made by defendants focus solely on establishing the absence of a causal connection between the case before the Honorable Robert J. Ward and the action that defendants allegedly took against Scott. Defendants note that there are no common defendants between the case before Judge Ward and the defendants named in the third claim. *See Bryant v. Goord,* No. 99 Civ. 9942, 2002 WL 553556, at *2 (Apr. 11, 2002) (finding no basis for retaliation where grievances filed by plaintiff concerned different individuals than defendants who instituted disciplinary proceedings against plaintiff). While the lack of common defendants provides some evidence that no retaliation took place, that fact alone is not dispositive. The Second Circuit recently reversed a grant of summary judgment for corrections officers where plaintiff had alleged retaliation following the settlement of a prior lawsuit involving correctional officers at a different facility. *See Bennett v. Goord,* 343 F.3d 133 (2d Cir.2003). Of greater relevance, however, is the fact that Scott has failed to allege any facts which would give rise to an inference of a causal

connection between the litigation before Judge Ward and the transfer from Sullivan.

Scott has also alleged that the transfer was in retaliation for his complaints about "the repeated and illegal urine tests." Compl. ¶ 71. Scott has not alleged that he filed any grievances by March 23, 1999, when the transfer was initiated. However,

> it is clearly established that prison officials cannot impose or threaten imposition of significant harm or risk of harm on a prisoner in retaliation for that prisoner's exercise of a First Amendment right, whether the inmate seeks a redress of grievances by filing a court action, an official grievance, or even an informal complaint.

*Riley v. Kurtz,* 893 F.Supp. 709, 723 (E.D.Mich.1995). Unlike the alleged retaliation for his litigation, Scott has alleged a sequence of events which could establish a causal connection between his complaints and the transfer. Following his disciplinary hearing, Scott asked Gardner why he had approved so many urine tests. According to Scott, Gardner became upset and told Scott that he would not "have to worry to[o] much longer because [Gardner] had had enough of him." Compl. ¶ 69. Scott next alleges that "based on DOCS departmental records," Gardner caused a transfer order to be submitted which was approved by John Doe # 2. *Id.* at ¶¶ 70, 126. Scott also notes that other inmates at Sullivan who had worse disciplinary records than Scott were not transferred. Defendants have not provided any evidence to contradict Scott's allegations. Under the factors laid out in *Rivera, see* 119 F.Supp.2d at 339, Scott has made sufficient allegations to survive summary judgment. Because there has been no formal discovery in this litigation, defendants are still entitled to rebut Scott's allegations by showing that DOCS "would have ...

transferred him 'even in the absence of the protected conduct.' " *Bennett*, 343 F.3d at 137 (*quoting Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996)).

### Scott's Confinement in SHU Does Not Implicate Liberty Interests and His Due Process Rights Were Not Violated In Any Case

Defendants argue that Scott's confinement for 90 days in SHU does not implicate liberty interests and therefore that the disciplinary hearing that resulted in Scott's sanction did not require procedural due process protections.

■ Prison disciplinary proceedings resulting in restrictive confinement do not violate procedural due process "unless the confinement subjected the prisoner to 'atypical and significant hardship' on the inmate in relation to the ordinary incidents of prison life." *Colon v. Howard*, 215 F.3d 227, 230 (2d Cir.2000) (*quoting Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). The Second Circuit has held that confinement in "normal SHU conditions" up to 101 days do not violate the *Sandin* test. *Colon*, 215 F.3d at 231; *Sealey v. Giltner*, 197 F.3d 578, 589–90 (2d Cir.1999). The Second Circuit described an example of "normal SHU conditions" as follows:

> Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration were less than the general population. The number of books allowed in the cell was also limited.

*Colon*, 215 F.3d at 230. Apart from Scott's allegation that he was double-celled, the conditions Scott describes of his confinement in SHU are not materially at variance with these. Compl. ¶¶ 109–121. Confinement in a double occupancy cell may also be a part of normal SHU conditions. *See Cox v. Malone*, 199 F.Supp.2d 135, 135 n. 2 (S.D.N.Y.2002) (describing SHU confinement conditions). Double-celling may also occur either in keeplock or in the general population.

Scott argues that the inquiry should focus on the 180 days which was imposed as his sanction rather than the 90 days he actually served. In the one case which relied on the penalty imposed, *Scott v. Albury*, 138 F.3d 474, 476 (2d Cir.1998), the difference between the penalty imposed and the penalty served was two days. *See Colon*, 215 F.3d at 231 n. 4 (60 days imposed and 58 served). Both *Colon* and *Sealey* have relied on the penalty served. *See id.*

The cases cited by Scott do not establish that 90 days in normal SHU conditions implicates a liberty interest. In *Ortiz*, the Second Circuit considered plaintiff's allegation that "he was subjected to unusually harsh conditions during his confinement," in ordering counsel for plaintiff's appeal. *Ortiz*, 323 F.3d at 195–96. And in *Wright v. Coughlin*, 132 F.3d 133 (2d Cir.1998), the plaintiff served 168 days in SHU and 120 days in keeplock.

However, in recognition of the fact that at least one Second Circuit panel has found that a liberty interest may be implicated by a 90 day stay in SHU, *see Welch v. Bartlett*, 196 F.3d 389, 392–394 (2d Cir. 1999), a review of Scott's disciplinary hearing is in order.

The Second Circuit has summarized the requirements of due process as follows:

> As the Supreme Court has held, due process requires that in a disciplinary

hearing resulting in imposition of loss of good time credits or solitary confinement, an inmate must be afforded advance written notice of the charges against him and a written statement of fact findings supporting the disposition and reasons for the disciplinary action taken. *See Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Subject to legitimate safety and correctional goals of the institution, an inmate should also be permitted to call witnesses and present documentary evidence. *Id.* at 566, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935. This Court has held that *Wolff*'s protections apply to an inmate facing SHU confinement and that an inmate has a right to a fair and impartial hearing officer. *See McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983). In addition, the Supreme Court has held that a hearing disposition must be supported by at least "some evidence." *See Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

*Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999).

■ By cause of action, Scott has alleged that defendants violated his right to due process by 4) destroying the urine specimen container before the hearing; 5) denying him the opportunity to introduce the watch commander's log book entries into evidence; 6) denying him the opportunity to argue that he was improperly selected for testing; 7) denying him the opportunity to call Gardner as a witness; 8) denying him an opportunity to call an outside chemical witness; 9) having Longobardo serve as a witness against him by referring to information supplied by others outside the hearing; and 10) failing to provide him with a written statement setting forth the reasons for denying the use of the log book entries.

Scott has submitted the complete transcript of his disciplinary hearing, making it clear that he was not denied due process. Scott Aff. Exh. 43. Scott received three days notice. *Id.* at 1. Longobardo advised Scott of his rights, ensured that Scott had all the documents he requested and was aware of his right to an assistant. *Id.* at 1–2. The charges were read. *Id.* at 3. Scott was allowed to identify his objections. *Id.* Scott was allowed to call witnesses. As a result, Sergeant Dunn appeared at Scott's request. *Id.* at 6. Longobardo also offered to call Gardner as a witness, but Scott waived that right. *Id.* at 4, 14. Scott was allowed to question witnesses through Longobardo. *Id., passim.* Scott was allowed to make a statement on his own behalf. *Id.* at 14. Longobardo made specific findings. *Id.* at 15. Scott was advised of his right to appeal. *Id.* at 16. Scott was allowed to raise many issues on appeal. Scott Aff. Exh. 42.

■ Scott's fourth cause of action, alleging denial of due process from the destruction of the urine specimen container, is dismissed because there is no right to preservation of sample evidence. *See California v. Trombetta,* 467 U.S. 479, 491, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (no right to preservation of sample in drunk driving prosecution).

Scott's fifth, seventh and tenth causes of action are meritless. Scott acknowledged that he received all the documents he requested. Scott Aff. Ex. 43 at 2. It was explained to Scott that his objections related to the log book entry were irrelevant because even if Gardner was not the watch commander that day, he was the Acting Captain and could authorize a drug test. Further, Longobardo offered Scott an opportunity to call Gardner as a witness, although repeatedly insisting that his testimony was irrelevant.

■ Scott's sixth cause of action alleges that Longobardo "fail[ed] and refus[ed] to consider plaintiff['s] defense that he was improperly selected and ordered to submit a urine sample" in violation of *Lahey v. Kelly*, 71 N.Y.2d 135, 518 N.E.2d 924, 524 N.Y.S.2d 30 (N.Y.1987). Compl. ¶¶ 141–42. In dicta, *Lahey* does state that an inmate may "challenge whether the test was authorized under the grounds stated in 7 N.Y.C.R.R. 1020.4." 71 N.Y.2d at 144, 524 N.Y.S.2d 30, 518 N.E.2d 924. But when directly presented with the issue, a New York court found "no authority which would entitle an inmate to challenge the sufficiency of the grounds upon which a correction official may order a urinalysis test." *Shaffer v. Hoke*, 174 A.D.2d 787, 788, 571 N.Y.S.2d 117 (3d Dep't 1991) (citing 7 N.Y.C.R.R. § 1020.4). The state court properly made this ruling in light of the fact that a prisoner charged with violating a prison rule or regulation is entitled only to minimal due process rights. *Id.* (*citing Wolff*). Further, Scott did raise the argument that the random drug testing may have been "a hoax" and a cover for the lack of evidence to administer a drug test on suspicion. Scott Aff., Exh. 43, at 13. Accordingly, the sixth cause of action is dismissed.

■ Scott's eighth cause of action is dismissed because the transcript shows that Scott did not request a witness to testify on the issue of whether particular medications could cause a false positive result on the urinalysis. Scott Aff., Exh. 43 at 9. Scott challenged the expertise of the nurse and was told that "the Nurse's expertise is at a level that we will accept for the purposes of this hearing." *Id.* Scott then revealed the medications he was taking, and was told that it would not register a false positive. *Id.* In any case, Scott's right to call witnesses is subject to the "correctional goals of the institution." *Kalwasinski*, 201 F.3d at 108.

Scott's ninth cause of action alleges that Longobardo acted as a witness against Scott when he allowed C.O. Borella and Dunn "to supply evidence in an out-of-hearing capacity in order to resolve factual disputes so that he would not have to call witnesses." Compl. ¶ 153. Scott is entitled only to have "a fair and impartial hearing officer," *Kalwasinski*, 201 F.3d at 108, and nothing in the transcript suggests that Longobardo was not fair and impartial. "The Supreme Court has made it clear that [disciplinary] hearings 'are not part of a criminal prosecution', and the full panoply of rights due a defendant in such proceedings does not apply." *Greaves v. State of New York*, No 95 Civ. 9725, 1997 WL 278109, at *3 (S.D.N.Y. May 22, 1997) (*quoting Wolff*, 418 U.S. at 556, 94 S.Ct. 2963). Accordingly, the ninth cause of action is dismissed.

### Scott's Right to Privacy Was Not Violated

■ Scott's eleventh cause of action alleges that defendants violated his right to privacy by coercing him into revealing confidential medical information in order to rebut the charge that he had tested positive for drug use. However, the transcript reveals that Scott voluntarily revealed the medications he was taking. Scott was advised that "if the inmate wishes to divuldge [sic] the specific medications that he is on and give up his confidentiality SYVA does have what they call a cross reactivity manual. . . ." Scott Aff., Exh. 43 at 9. Upon being informed of this, Scott revealed the drugs he was taking without any objection. The request at the hearing was reasonable, as inmates may be required to disclose confidential medical information if it is related to "legitimate penological interests." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir.1999). Whether

Scott was taking prescribe medications was relevant to the disciplinary charge he faced. *See* 7 N.Y.C.R.R. § 270.2, Rule 113.24 ("Inmates shall not use or be under the influence of any narcotics or controlled substances unless prescribed by health service providers."). Accordingly, the eleventh cause of action is dismissed.

### Conclusion

Defendants' motion for summary judgment is denied as to the third claim as it relates to Scott's transfer from Sullivan in retaliation for his complaints about staff misconduct at Sullivan. Scott's claim survives only as to defendants Gardner and John Doe # 2. As to the remainder of the third claim: the portion of the claim relating to allegedly retaliatory urine tests is dismissed without prejudice for failure to exhaust administrative remedies. The portion of the claim alleging that the disciplinary hearing was a retaliatory act is dismissed with prejudice for failure to state a claim, as is the allegation that the transfer from Sullivan was in retaliation for litigation before Judge Ward.

The first claim is dismissed without prejudice for failure to exhaust administrative remedies. The second claim is dismissed as barred by the statute of limitations as to the OMH defendants, and dismissed for failure to exhaust as to the DOCS defendants.

The fourth, fifth, sixth, seventh, eighth, ninth, tenth and eleventh causes of action are dismissed for failure to state a claim.

It is so ordered.